SMALL, P.J.T.C.
This is a case under the New Jersey Corporation Business Tax (the “CBT”) (N.J.S.A. 54:10A-1 to -40) which requires me to determine whether, within the meaning of N.J.S.A. 54:10A-6(B)(6), certain business receipts of the plaintiff are earned in New Jersey or elsewhere. More specifically, I must decide whether securities bought and sold by the plaintiff, a New Jersey domiciled company, are “integrated with a business carried on in another state” within the meaning of N.J.A.C. 18:7-8.12, in order to determine whether those receipts are “earned” at the location of the trader employed by the plaintiff or at the location of plaintiffs customers.
I.
On June 25, 2002, I rendered an opinion in this matter denying the parties’ motions for judgment on the pleadings. After discussing the law and facts, I determined that the factual record needed to be supplemented so that I could determine: whether, plaintiff conducted a business in other states, and if it did (1) the nature of its business in the other states, and (2) whether the securities traded by plaintiff were integrated with its business conducted in other states.
The parties engaged in discovery after that ruling and have adopted the plaintiffs answers to those interrogatories as the facts *219 in this case. Thus both parties agree that there are no material facts in dispute. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995). Both parties have moved for summary judgment.
This opinion incorporates the findings and analysis found in my June 25, 2001 opinion as supplemented by the additional facts and arguments submitted since that date. I conclude that plaintiff correctly allocated its receipts to the location of its customers and not to the location of its traders.
II.
Plaintiff, Mayer & Schweitzer, Inc. (M & S), is a New Jersey Corporation. M & S is a “market-maker” in the over-the-counter securities market. A market-maker purchases and sells securities using its own capital, maintains an inventory of those securities, and then attempts to sell or purchase those securities for a profit. During the tax years in issue, 1992 through 1995, M & S maintained two offices in Jersey City, and additional offices in Florida, Illinois, and Colorado. M & S also owned a data processing facility in Arizona, which was leased to a related company. During the years 1992 to 1995, the Arizona facility did not perform any services for M & S.
The President and Vice President of M & S were resident in the New Jersey office. The Florida and Illinois offices both housed traders and sales and correspondent service personnel. The Colorado office housed only sales and correspondent service personnel. The New Jersey offices, both located in Jersey City, housed traders and sales personnel, as well as M & S’s administration, operations, systems, and compliance personnel. All of M & S’s personnel at the New Jersey, Florida, Illinois, and Colorado locations were M & S employees, with the exception of occasional office temps or consultants.
The vast majority of M & S’s customers were not the end-purchasers of the securities purchased and sold by M & S. M & S’s customers were other broker dealers and institutional customers who needed securities they did not have in inventory in order *220 to carry out transactions (purchases or sales) for their own customers. The balance of the customers were other market-makers.
The sales personnel housed in the New Jersey, Florida, Illinois, and Colorado offices were primarily responsible for developing new business for M & S, and also maintaining accounts they brought in. They performed them employment duties by phone and by attending Securities Traders Association conventions throughout the United States on a regular basis. The correspondent service personnel housed in the New Jersey, Florida, Illinois, and Colorado offices were basically responsible for maintaining house accounts. House accounts are customers who came to M & S unsolicited or through non-sales personnel. Generally, no trading or solicitation of new business was done by these correspondent service personnel.
M & S’s income was not derived from commissions, like a retail securities broker. The source of M & S’s income was the trading profit (the difference between the prices paid by M & S to acquire securities and the price charged to those purchasing the securities from M & S) on securities it risked its own capital to acquire.
The M'& S traders located in the New Jersey, Florida, and Illinois offices dealt with customers throughout the United States. During the years in question, M & S was registered or licensed in twenty-two states (including New Jersey) in which it traded its securities. These were not the only states in which M & S conducted trading activity. Some states did not require a market-maker like M & S to register or be licensed in order to conduct its business.
M & S’s trading room managers (located in New Jersey, Florida, and Illinois) determined for which securities the firm would act as a market-maker based on a variety of factors. All of these decisions were made internally. The total number of securities for which M & S acted as a market-maker at any given time was extensive. However, the majority of securities were purchased and sold out of the New Jersey offices. The record indicates that 2814(75%) issues were traded out of the New Jersey *221 office, 777(21%) were traded out of the Florida office, and 149(4%) were traded out of the Illinois office. The particular office location out of which the trading of a particular security was handled was determined by the trading manager’s selection of who the trader or traders would be.
Traders generally conducted trades electronically from the location (New Jersey, Florida, or Illinois) at which they were physically located, in the following manner, regardless of whether the transactions were sell orders or purchase orders:
1. The securities owed by M & S for its own account were held at the Depository Trust Company (DTC) in New York City, which acted as a central clearing repository.
2. The securities were registered in a nominee or “street name.”
3. M & S traders received orders from prospective purchasers throughout the United States by telephone or via electronic order routing and execution systems such as SOES (a small order execution system implemented in the aftermath of the 1987 stock market crash) and SelectNet (an order routing and negotiating system between NASDAQ member firms), both of which are NASDAQ-related electronic systems.
4. While the size of the order and market conditions determined the exact method of execution, orders received electronically would generally be executed electronically.
5. As the trade was electronically executed by the trader sitting at his or her terminal in New Jersey, Florida, or Illinois, the DTC in New York -would electronically transfer the stock out of M & S’s account, into the accounts of M & S’s customers, who were located throughout the country.
6. Since M & S’s data processing systems were located in Jersey City, orders received electronically would be processed through Jersey City, and would ultimately be reported to the clearing agencies through the data processing system located in Jersey City.
7. Confirmation of the trade would be electronically transmitted to the purchaser upon the completion of the trade.
8. Because most orders were executed electronically, paperwork was not typically produced or received in conjunction with orders.
9. Physical transfer of possession of the securities was rare.
10. The trades would be reflected in the books of M & S at the time the order was executed.
11. The passage of title would be confirmed electronically at the customer’s end upon completion of the trade.
12. Title to the security passed to the buyer in whatever state the buyer was located.
*222 13. Final settlement occurred five days after the trade date at which time the customer would be reflected in the DTC in New York as the owner of the security.
On its CBT returns for each of the years in issue, 1992 through 1995, M & S calculated the receipts fraction component of its apportionment factor under N.J.S.A. 54:10A-6(B) by including in the numerator the trading profits from the trades performed by its New Jersey employees. M & S thereafter filed amended returns which included in the numerator of the receipts fraction only receipts from sales to customers located within New Jersey. In other words, it excluded from the numerator the receipts from sales to customers located outside of New Jersey. The amended returns claimed refunds in the following amounts: $1,216,142 (1992); $1,419,112 (1993); $940,480 (1994); and $339,551 (1995), totaling almost $4,000,00o.[1] The Division of Taxation denied the refund claims by letter dated November 28, 1998. M & S protested the denial by letter dated March 2, 1999, and a final determination upholding the denial was issued by the Division on February 9, 2000.
The complaint in this action was filed on May 9, 2000. M & S moved for summary judgment, and the defendant Director moved for dismissal on the grounds that M & S’s complaint failed to state a claim for relief. In a letter dated June 25, 2001, I denied both motions: (a) the Director's motion was premature, M & S had not had the opportunity to develop facts that might prove that its sales of securities by traders in New Jersey were sufficiently integrated with its business carried on in another state in accordance with the Director’s regulation, See N.J.A.C. 18:7-8.12; and (b) if they could establish those facts, M & S would be entitled to judgment in its favor.
III.
The CBT “imposes a franchise tax on every nonexempt foreign and domestic corporation ‘for the privilege of having or exercising *223 its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State.’ ” Hess Realty Corp. v. Director, Div. of Taxation, 10 N.J.Tax 63, 65 (Tax 1988) (quoting N.J.S.A. 54:10A-2). The amount of franchise tax imposed is determined annually based on the taxpayer’s entire net income.[2] Entire net income is defined as the “total net income from all sources, whether within or without the United States, and shall include the gain derived from the employment of capital or labor, or from both combined, as well as profit gained through a sale or conversion of capital assets.” N.J.S.A. 54:10A-4(k).
The CBT permits multi-state businesses to apportion income among states in which they conduct their business before determining the amount of franchise tax owed to New Jersey under N.J.S.A. 54:10A-5(a). N.J.S.A. 54:10A-6. See Hess Realty Corp., supra, 10 N.J. Tax at 65. See also Stryker Corp. v. Director, Div. of Taxation, 18 N.J.Tax 270, 276-77 (1999), aff'd o.b., 333 N.J.Super. 413, 755 A.2d 1200 (App.Div.2000), aff'd, 168 N.J. 138, 773 A.2d 674 (2001). Income is apportioned to New Jersey by multiplying entire net income by an apportionment factor, which for the years in question was the average of the corporation’s property, payroll, and receipts in New Jersey and its property, payroll, and receipts everywhere. N.J.S.A. 54:10A-6.[3] The apportionment *224 factor may be adjusted, however, if the Director determines that the allocation factor “does not properly reflect the activity, business, receipts, capital ... or entire net income of a taxpayer reasonably attributable to [New Jersey].” N.J.S.A. 54:10A-8.
IV.
In the present case, the only issue in dispute is the proper allocation of business receipts under N.J.S.A. 54:10A-6(B)(6), which provides:
ail other business receipts ... earned within the State, divided by the total amount of the taxpayer’s receipts, similarly computed, arising during such period from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State.
[Footnote omitted.]
Section (e) of the Director’s regulation, N.J.A.C. 18:7-8.12, specifically applies to receipts in this case and reads as follows:
Intangible income not apportioned by other provisions of these rules is included in the numerator of the receipts fraction where the taxable situs of the intangible is in this State. The taxable sitiis of an intangible is the commercial domicile of the ovmer or creditor unless the intangible has been integrated wiih a business carried on in another state. Notwithstanding that the commercial domicile is outside this State, the taxable situs is in New Jersey to the extent that the intangible has been integrated with a business carried on in this State.
Example: Taxpayer has its domicile outside this State. It is in the business of lending money, some of which is loaned to New Jersey residents. Interest income recognized from such loans is income derived from sources within this State and, as such, is earned in New Jersey. That interest income is includable in the numerator of the receipts fraction.
[(Emphasis added.)]
The three-factor formula is the standard method for apportioning income of a multi-state business. See, e.g., Avco Fin. Servs. Consumer Discount Co. One, Inc. v. Director, Div. of Taxation, 193 N.J.Super. 503, 507-09, 475 A.2d 66 (App.Div.1984), aff'd, 100 N.J. 27, 494 A.2d 788 (1985); Silent Hoist & Crane Co., Inc. v. Director, Div. of Taxation, 9 N.J.Tax 178, 187-188 (Tax 1987). It is known as the Massachusetts formula and was designed for a *225 manufacturing economy. See Brunswick Corp. v. Director, Div. of Taxation, 11 N.J.Tax 530, 539 (Tax 1991), aff'd, 13 N.J.Tax 136 (App.Div.1993), aff'd, 135 N.J. 107, 638 A.2d 805 (1994). “[E]ven though it does not provide mathematically precise territorial allocations of value, the legislatively designated three-factor formula has received judicial approval.” Hess Realty Corp., supra, 10 N.J.Tax at 86 (citation omitted); see also Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 170, 103 S.Ct. 2933, 2943, 77 L.Ed.2d 545, 556, reh’g denied, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983) (citation omitted) (emphasizing that the three-factor formula is the “benchmark against which other apportionment formulas are judged”).
The purpose of the three-factor apportionment formula is to provide a fair and constitutional basis for allocating taxable income among the states. See Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 283, 97 S.Ct. 1076, 1081, 51 L.Ed.2d 326, reh’g denied, 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371 (1977) (citation omitted) (emphasizing that “ ‘where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and ... may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer’s business done within the state’ ”). The formula’s application to a manufacturing business or other business dealing in tangible products is generally straightforward and simple. But see Stryker Corp. v. Director, Div. of Taxation, supra. As this case illustrates, the three-factor formula becomes more difficult to apply to receipts from the sale of services or receipts from the sale of intangibles.
The parties agree that, under the New Jersey taxing pattern, if a tangible asset were sold by a trader in New Jersey to a purchaser in another state and delivered in that other state, that receipt would be earned in the other state. N.J.S.A. 54:10A-6(B)(1) and (2). It is also clear from the Director’s regulations and cases decided under the Corporation Income Tax Act, (N.J.S.A. 54:10E-1 to 21), that if a loan is made by an out-of-state lender to a New Jersey borrower, the interest on that loan is *226 considered derived from sources in New Jersey as is prescribed by N.J.A.C. 18:7-8.12. SeeAvco Fin. Servs., supra, 100 N.J. at 36-37, 494 A.2d 788 (citation omitted); see also Tuition Plan of N.H. v. Director, Div. of Taxation, 4 N.J.Tax 470 (Tax 1982); Chemical Realty Corp. v. Taxation Div. Dir., 5 N.J.Tax 581 (Tax 1983), aff'd o.b., 6 N.J.Tax 448 (App.Div.1984). At oral argument the Director conceded that the mirror image of that rule would apply for a New Jersey lender. Thus, if a New Jersey lender lent money to a foreign borrower, the interest on that loan would be allocated to the foreign state. If M & S were a typical retail securities dealer charging a commission, the receipt of the commission would be considered earned at the location of the trader as it is considered the receipt from a service performed at the location of the retail broker or trader. N.J.S.A. 54:10A-6(B)(4), N.J.A.C. 18:7-8.10(b). But see L. 2002, c. 40, the Business Tax Reform Act (the “Act”) § 26(b) changing the rule and allocating securities brokers’ commissions to the location of the customer for tax years beginning on or after January 1, 2002.[4]
The key language of the Director’s regulation states that “[t]he taxable situs of an intangible is the commercial domicile of the owner or creditor unless the intangible has been integrated with a business carried on in another state.” N.J.A.C. 18:7-8.12 (emphasis added). Thus, unless the securities sold by M & S to out-of-state purchasers have been integrated with M & S’s business outside of New Jersey, those receipts are New Jersey receipts.
Precisely what “integrated with” means has not been defined by the Legislature or the Director. To look at dictionary definitions and materials not addressed by the parties would only amount to a justification of a result and not a foundation for a finding. It is precisely case-by-ease determinations, like the one to be made in this case, which will set the parameters for what is and what is not *227 “integrated with a business carried on in another state.” A single restaurant in New Jersey owned by a company which also owns a cement plant in Maine is probably not “integrated” with the business of the cement plant. A New Jersey restaurant which is part of a chain of restaurants in all fifty states is probably integrated with the business carried on in the other states.
M & S argues that, based on the facts in this case, I must conclude that its securities trading activities are integrated with M & S’s business outside of New Jersey, and, therefore, receipts from those sales should be allocated to the states in which its customers are located. M & S further argues that its case is no different from that of a New Jersey lender and an out-of-state borrower. The Director distinguishes that circumstance by indicating that the decided case law relates to the Corporation Income Tax where the term used is “source” of the income and not where it is “earned.” Compare N.J.S.A. 54:10E-2 with N.J.S.A. 54:10A-6(B)(6). The Director argues, from the second sentence of N.J.A.C. 18:7-8.12(e), that the intangibles, in this case the securities, have not been integrated with the business carried on in other states because, unlike the lending of money where the money goes to the state of the borrower, the securities here are not sent to the state of the purchaser. In dealing with intangibles, distinguishing between the destination of securities and money is very ephemeral. By their nature, intangibles are hard to locate. I find that, although most of M & S’s traders are located in New Jersey, it has other sales and correspondent personnel located in other states and that they call on and call customers in those states and other states and meet with customers at various locations throughout the country.
In the present case, M & S earns its income by selling securities at a higher price than originally purchased, not by charging commissions to the dealers who purchase the securities offered by M & S. In the latter case, income earned by M & S would be allocated to New Jersey as the receipt of commissions from services under N.J.S.A. 54:10A-6(B)(4).
In Stryker Corp., supra, the courts held that the sale of prosthetics from a New Jersey manufacturer to a New Jersey *228 wholesaler, where the products purchased were shipped by the manufacturer directly to the wholesaler’s out-of-state customers, (commonly referred to as a “drop shipment”) were included as “other business receipts ... earned within” New Jersey under N.J.S.A. 54:10A-6(B)(6). 18 N.J.Tax at 287. The Tax Court acknowledged that the transactions involved were not contemplated in the other subparagraphs of N.J.S.A. 54:10A-6(B), and that N.J.S.A. 54:10A-6(B)(6) was created to “address[ ] such transactions.” Id. at 286. The Tax Court in Stryker concluded that the taxable situs of the sales from the New Jersey manufacturer to the New Jersey wholesaler was New Jersey, without considering the geographic location of the wholesalers’s customers. Id. at 287. The Tax Court explained that the single factor that determines whether receipts are included “in the numerator of the receipts fraction” is “whether the receipt was ‘earned by the taxpayer within New Jersey.’ ” Id. at 286 (quoting N.J.S.A. 54:10A-6(B)(6)). The court held that “[t]he transactions generating plaintiffs receipts were New Jersey transactions, and the receipts were earned in New Jersey.” Id. at 287. The Supreme Court agreed that the transaction between Stryker and its New Jersey wholesale subsidiary had no connection with any state other than New Jersey and that, as a result, the receipts could only be New Jersey receipts. Stryker Corp., supra, 168 N.J. at 155, 773 A.2d 674.
In the present case,, M & S sells intangibles to purchasers in New Jersey and other states. Unlike the interest on loans made by a New Jersey Corporation to out-of-state residents, M & S’s sale of securities to non-New Jersey purchasers are not “secured” by out-of-state collatei’al. The activity of the New Jersey trader is in New Jersey, not in the state where the purchaser is located. The questions thus are: Whether M & S is conducting a business in other states? What is the nature of that business? And, are the traded securities integrated with that business?
Y.
After considering the further submissions by the parties, I find that the parties agree on the location of a sale for purposes of *229 calculation of the sales factor of the apportionment formula under N.J.S.A. 54:10A-6(B)(6) in certain instances.
I. Sales allocated to location of sales person:
(a.) Commission sale of a security (sale of a service, investment advice)
II. Sale allocated to location of customer:
(a.) Loan
(b.) Sale of tangible personal property.
However, in the case before me, the parties disagree. M & S argues that its sale of securities is different from the commission sale of a security because the profit is earned not from the rendering of a service by a broker, but from the “spread,” or difference between the price paid by M & S to purchase the security and the price realized by M & S on its subsequent sale of the security. It makes this profit through the exploitation of the out-of-state markets not the rendering of a service by the traders in New Jersey to its out-of-state customers.
M & S also argues that to allocate the sales to New Jersey, in effect, double weights the payroll factor. Thus, since the bulk of M & S’s traders are located in New Jersey, it already has very high payroll and property factors in New Jersey. To also allocate the bulk of its sales to New Jersey would create an apportionment factor heavily weighted towards New Jersey with little consideration given to the fact that the company is exploiting markets throughout the nation.[5]
I have concluded that M & S, though domiciled in New Jersey, is carrying on a business throughout the nation. Unlike Stryker, where the sales by Stryker to Osteonics were entirely New Jersey transactions, the transactions in this case involve the exploitation *230 of out-of-state markets. I find under N.J.A.C. 18:7-8.12 that “the [sale] of the intangible has been integrated with a business carried on in [ ]other statefs]”.
The activities of M & S’s sales people in New Jersey are virtually identical to the activities of the sales people of a company selling tangible goods which are delivered out-of-state. The structure of a taxing system designed for a manufacturing economy must adapt itself to the realities of modem business practices and an economy which raises revenues from sources other than the sale of tangible goods.
After a careful examination of the facts in this case, I find that the sales by M & S must be allocated to the location of the customer. Any other conclusion would be inconsistent with the regulation (N.J.A.C. 18:7-8.12) and the principle which the apportionment regulation is designed to serve, a fair apportionment of income, for tax purposes, to the states in which a corporation does business.
The Director argues that I must uphold his interpretation of his regulation. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984). However, when his interpretation is inconsistent with the plain meaning of the regulation and is inconsistent with the facts as found by me (that M & S conducts an integrated business in many states), I am not bound by the Director’s interpretation. Koch v. Director, Div. of Taxation, 157 N.J. 1, 7, 722 A.2d 918 (1999); Richard’s Auto City v. Director, Div. of Taxation, 140 N.J. 523, 530, 659 A.2d 1360 (1995); Fedders Fin. Corp. v. Director, Div. of Taxation, 96 N.J. 376, 385, 476 A.2d 741 (1984); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575, 384 A.2d 795 (1978); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528-29, 197 A.2d 673 (1964). My ruling is consistent with the regulation adopted by the Director. The Director’s interpretation of the regulation’s application in this case is inconsistent with the regulation, and, at best, is proscribed ad hoc rulemaking in the course of an audit resulting from a refund claim. Metromedia, Inc. v. Director, Div. of Taxation, supra.
*231 Looked at from a broader perspective, those states in which M & S has customers would be free to tax M & S’s income and apportion income to those states based on the customer’s locations. M & S is present in those states by virtue of its being registered and licensed in those states and by its exploitation of the markets in those states and dealing with customers in those states. M & S would not be immune from taxation in those states by virtue of P.L. 86-272, which only protects vendors of tangible personal property from state income taxation for the mere solicitation of sales. See Wisconsin Dep’t. of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992). Modern concepts of nexus would not require M & S’s physical presence in those states to obligate it to pay a fairly apportioned tax to those states. See Quill v. North Dakota 504 U.S. 298, 307-08, 112 S.Ct. 1904, 1910-11, 119 L.Ed.2d 91 (1992) (stating that due process concepts of nexus do not require physical presence in a state if a foreign corporation avails itself of the benefits of an economic market). In fact, under New Jersey’s recently revised CBT, if those sales were not taxed in the other states they would be removed from the denominator of the apportionment fraction (the so called “throwout” rule). L. 2002 c. 40 § 8, amending N.J.S.A. 54:10A-6(B)(6).
Under L. 2002 c. 40, the allocation of sales as found by me is specifically prescribed by statute. The Assembly Budget Committee Statement to the Bill A. 2501 dated June 27, 2002 states:
Locating the receipts from financial services. The bill provides that the purpose of determining the sales fraction for allocating New Jersey receipts of broker/dealers and asset management firms, the sales occur where the customers receive the services, as opposed to where the services are performed as under current rules. This assures that New Jersey collects a fair share of tax from transactions that have as their practical effect a use of New Jersey economic opportunities and as a side effect removes a barrier to these financial service providers locating in New Jersey.
Thus the clear understanding of the Assembly Committee was that the law, as it relates to commission sales prior to amendment, was in accord with the Director’s position in this case. Although the Director’s regulation obviously predates the amended statute, it appears that no court had been called on to apply the statute *232 (before the recent amendment) to the case of a trader like M & S. Although the amended statute clearly changes the results for the allocation of commission sales which both parties agree were allocated to New Jersey prior to the recent amendment of the CBT, I find that the statutory amendment does not change the results in this case.
Allocating the sales in this case to the location of the customer is:
(a) consistent with the statute
(b) consistent with the Director’s regulation
(c) results in a fair apportionment of M & S income between the states; and
(d) is consistent with the amendments to the statute made by L. 2002 c. 40.
Although not obvious at first, M & S has a multistate business with the bulk of its property and trading personnel in New Jersey and the bulk of its customers throughout the nation. To allocate the bulk of its sales as well as the bulk of its payroll and property to New Jersey would result in an unfair apportionment of its income to New Jersey inconsistent with the CBT’s purpose and language.
For all the above reasons, I find that M & S’s amended returns were filed in accordance with the law and the refunds requested should be allowed. M & S’s motion for summary judgment is granted, the Director’s motion is denied.

M & S has represented that even if it were to receive this refund, its total CBT tax liability to New Jersey for the period 1992 thru 1995 would be $8,171,411.

 Prior to its amendment in 1982, the CBT was levied on both net income and net worth. Net worth is no longer utilized in computing the amount of franchise tax. See Hess Realty Corp., supra, 10 N.J. Tax at 65 n. 1 (explaining that the Legislature enacted a phased-out repeal of the net worth provision of the CBT as of 1986). See also L. 1982 c. 55.

 After July 1, 1996, the sales factor is double weighted. L. 1995, c. 245, §§ 1-2.
The property fraction is determined by dividing the average value of the tangible property located in New Jersey by the average value of the tangible property located everywhere. NJ.S.A. 54:10A-6(A). The payroll fraction is determined by dividing the wages, salaries, and other personal compensation paid to the business’ employees located in New Jersey by the wages, salaries, and other personal compensation paid to all of the business’ employees. N J S.A. 54:10A- 6(C). Thus, two-thirds of M & S's three part apportionment fraction is heavily weighted to New Jersey where the bulk of its property and *224 personnel are located. The receipts fraction is at issue in this case and discussed more fully in section IV of this opinion. NJ.S.A. 54:10A-6(B).

 Although § 33 of L. 2002 c. 40 states that this amendment (the one found in § 26 of the Act) is applicable to privilege periods ending after June 30, 1984, I am persuaded, as are counsel for both parties, that this is a typographical error resulting from the last minute renumbering of sections in the Business Tax Reform Act, and is intended to be applicable to § 27 of the Act relating to net loss carryovers.

 See footnote 1, supra, and the description of M & S’s business activity at p. 222 of this opinion.