NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

TAX COURT OF NEW JERSEY



**Mala Sundar**
**PRESIDING JUDGE**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
Fax:    (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

April 11, 2024

Mel E. Myers, Esq.
McManimon, Scotland, & Baumann, LLC
Attorney for Plaintiff

Anthony D. Tancini, Esq.
Deputy Attorney General
Attorney for Defendant

> Re:    Solix Inc. v. Director, Division of Taxation
>        Docket No. 011113-2019

Dear Counsel:

This opinion decides the above-referenced matter wherein plaintiff appealed defendant's final determination denying plaintiff's claim for refund of corporation business tax ("CBT") for tax years 2011 and 2012. The refund claim arose because plaintiff computed the numerator portion of the sales allocation factor using a market-based approach (i.e., assigning receipts from sales of its services to the state where its customers are located). Plaintiff used this method believing it to be most reflective of the economic realities of its business, which primarily was being a third-party administrator of governmental subsidy programs. Defendant rejected this approach in favor of the cost of performance ("COP") method reasoning that a major portion of plaintiff's services were performed in New Jersey, which is also where its computer servers and core management were located, and because plaintiff allocated over 90% of its payroll to New Jersey.

Based on the totality of evidence proffered at trial, and for the reasons explained below, the court finds in favor of plaintiff.

**BACKGROUND**

A corporate entity that does business both inside and outside of New Jersey, is subject to CBT on the income it allocates to New Jersey. N.J.S.A. 54:10A-6 prescribes how a taxpayer's allocation factor must be computed. Defendant, the Director, Division of Taxation (hereinafter "Taxation") may change or adjust the reported allocation if it does "not properly reflect" the reporting entity's activities in, or income from New Jersey, and may use any method "calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State." N.J.S.A. 54:10A-8(e).

One component of the allocation factor is the "sales fraction" which comprised of the "receipts of the taxpayer." N.J.S.A. 54:10A-6(B). For the tax years at issue, the numerator of the fraction included receipts from, among other sources, "services performed within the State." N.J.S.A. 54:10A-6(B)(4) (2011). The denominator of the fraction comprised of a taxpayer's receipts from all sources, in-and-out of New Jersey. N.J.S.A. 54:10A-6(B) (in-state receipts should be "divided by the total amount of the taxpayer's receipts . . . from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State").

N.J.S.A. 54:10A-6(B)(4) was silent as on how the numerator was to be calculated if the sold services were performed both in and out of state. Taxation's regulation, however, addressed this situation by providing that if services were "performed both within and outside this State, the numerator of the receipts fraction" should "include[] receipts from services based upon the [COP] or amount of time spent in the performance of such services or by some other reasonable method

2

that should reflect the trade or business practice and economic realities underlying the generation of the compensation for services." N.J.A.C. 18:7-8.10(a) (2009).  COP was "defined as all direct costs incurred in the performance of the service, including direct costs of subcontractors." Ibid. Receipts were "allocable" regardless of whether services were performed by the taxpayer's employees, agents, or subcontractors, and where the receipts were payable or received.  N.J.A.C. 18:7-8.10(a)(1); (a)(2) (2009).

Two examples of business activities captured by the above regulation were (1) advertising, where the "appropriate method of assigning the portion of" revenues "to services performed in New Jersey" was "the proportion of [taxpayer's] listening audience in New Jersey;" and (2) the "sale of long- distance telephone communications service[s]" where the "appropriate method of allocating . . .  long distance toll revenues attributable to services performed in New Jersey" was "upon billing for calls originating in New Jersey."  N.J.A.C. 18:7-8.10(a) (2009).

A separate regulation provided a calculation of the numerator of the sales fraction under a 25-50-25 method for "certain service fees" wherein 25% of such fees are allocated to the state of origination; 50% to the state where service is performed; and 25% to the state in which the transaction terminates.  N.J.A.C. 18:7-8.10(c) (2009).  Two examples when the 25-50-25 method applied were (1) where a credit card issuer provided funds to customers using machines in New Jersey, but its computer servers, located outside the State, performed credit checks; and (2) where a taxpayer earned income by "providing on-line internet access to customers located within and outside New Jersey" with equipment located outside the State.  Ibid.[1]

---

[1]  N.J.S.A. 54:10A-6(B)(4) was re-written in 2018 (effective for tax years after July 31, 2019). The amended statute provides that receipts from "sales of services" should be included in the sales fraction "if the benefit of the service is received at a location in this State."  If the "the benefit of the service is received both at a location within and outside this State," the New Jersey allocable

**PLAINTIFF'S OPERATIONS**

Plaintiff, Solix, Inc. ("Solix") is a Delaware corporation headquartered in Parsippany, New Jersey. It had about 900 employees, with roughly 300 located in New Jersey. Solix provided web-based business solutions to its customers, which included the creation or customization of its proprietary software that was designed and developed by Solix's information technology ("IT") team (70-75 employees) in New Jersey. The main computer servers were in New Jersey. All executive functions, such as management, finance, human resources, payroll, and contract review/finalization, were performed in New Jersey.

Solix's two primary business lines supported the Lifeline and E-Rate programs, wherein it was the third-party administrator for out-of-state governmental entities in operating and managing governmental subsidy programs for the benefit of the residents of those states.[2] In other words,

portion "is based on the percentage of the total value of the benefit of the service received at a location in this State or a reasonable approximation to the total value of the benefit of the service received in all locations both within and outside this State." N.J.S.A. 54:10A-6(B)(4)(i). If the destination state(s) is/are undeterminable, sourcing is based on the customer's billing address or the location from which the services were ordered in the customer's regular course of operations (or billing address). N.J.S.A. 54:10A-6(B)(4)(ii); (iii).

As a result, Taxation adopted a new regulation, N.J.A.C. 18:7-10A effective September 8, 2020. See 52 N.J.R. 508(a) (2020) (regulation adopted due to statutory change which "provide[s] for market sourcing based on where the benefit of the service is received by the customer"). The new regulation "no longer require[s] that the numerator of the sales fraction include receipts from services based upon the [COP] or amount of time spent in the performance of such services, or by some other reasonable method, if the service is performed both within and outside this State" and is intended "to assign and allocate to New Jersey income earned by a taxpayer based upon where receipts are earned or sales are undertaken, and not where performance of the service(s) is undertaken or how much time and/or resources is spent performing said service(s)." Ibid. The new regulation also eliminated the 25-50-25 method.

[2] Solix spun out of a non-profit entity, the National Exchange Carrier Association ("NECA"). NECA used to perform various functions for the Federal Communications Commission ("FCC") in connection with regulatory controls of telecommunication carriers and included administering a subsidy program called Lifeline under the Universal Services Fund ("USF"). NECA also administered another federal subsidy program called E-Rate, which was established by the FCC

4

these entities outsourced the operations of the subsidy programs to Solix, subject to the entities' oversight, reporting requirements, and audits.

The Lifeline program, which accounted for roughly 40% of Solix's business, involved administering governmental subsidies under the USF (see n.2) so that economically or physically disadvantaged members of the public would receive discounted telephone services. It was a predominantly federal subsidy program. Some states also offered a version of Lifeline (with State-specific eligibility requirements) for the same purpose. Solix operated and managed the program for the federal government, Oklahoma (which also included regulating utilities), California, Oregon, and about ten to twelve other States.

A basic description of Solix's services is thus: a public entity would seek out Solix's services. Solix's representatives would then meet with the entity and provide web-based solutions for administering the USF under the Lifeline program by using Solix's proprietary software or creating customer-specific software programs. After Solix was retained (after a bid process or a contract renewal), it would receive data from the subsidy provider identifying the targeted subsection of the public (low income individuals, those receiving public benefits or other social subsidies). Some governments such as Texas provided Solix with confidential/encrypted data files containing information of the potentially eligible individuals. In other cases, Solix obtained customer lists from telecommunications providers. Data exchanges between the out-of-state customer and Solix were done electronically.

The subsidy provider and/or the commercial telecommunications provider would notify the public of the Lifeline program, and encourage individuals to apply via the internet, by mail, or

---

with oversight by a nonprofit entity, Universal Service Administration Company ("USAC"). Solix inherited both business lines, and later expanded the Lifeline program to include wireless carriers.

by calling a toll-free telephone number (all of which were directed exclusively to Solix). Once the applications were received, Solix's over-500 employees located at the call centers in Illinois, Indiana, and Texas, processed the applications from start to finish, i.e., from initial review through their grant or denial. The review included ensuring accuracy and completeness of applicant information, and a check to ensure that applicants' data matched information provided the subsidy provider. If applications were incomplete or raised other red flags (e.g., income declaration did not match its supporting document), Solix rejected them but also assisted individuals in reapplying. At various stages, Solix advised applicants of their application's status and whether there were issues. These were high-volume services. For example, Solix's Texas call center alone routinely handled about 1 million customer queries or issues. After Solix was satisfied that the application information was accurate and complete, it approved the same, and conveyed the eligibility determination to the subsidy provider. The same process followed if Solix denied an application.

Solix provided similar services to commercial telecommunication carriers that independently sought to participate in the subsidy program. Solix would identify and qualify eligible customers of the carrier and assist the carrier in seeking reimbursement of the subsidy from the government.[3]

The federal government paid the subsidies to the telecommunications carriers. Under state USF programs, Solix served as the fiscal agent for governmental clients. Thus, Solix reviewed applications for state funds, billed and collected assessments from telecommunication service

---

[3] For instance, Virgin Mobile would inform its customers of governmental discounts, have them apply for the discount or credit through Solix, which would then verify their eligibility, and thereafter, Virgin Mobile could apply for reimbursement from the government. Virgin Mobile was Solix's only New Jersey based commercial customer, which had telecommunications business in over 40 states. Solix's services to Virgin Mobile encompassed all States in which Virgin Mobile conducted business.

providers, and disbursed state subsidies to eligible recipients including service providers. Solix performed those functions in New Jersey.

Solix also assisted non-New Jersey public entities to ascertain appropriate assessments, rates, or surcharges, to be levied upon utility services providers (which funded some or all the subsidies under the Lifeline programs). These services entailed Solix making substantive, data-based presentations out-of-state, to non-New Jersey governmental authorities.

Solix's management traveled frequently to meet its out-of-state customers, whether for sales presentations, software specifications, or to address applicant issues. While the federal government was more hands-off, some governmental entities were not. For instance, the Texas Public Utility Commission was involved in the entire process. Solix's representatives traveled to Texas every few months in this regard. California (where Solix was a third-party administrator for the public utility commission) entailed bi-monthly in-person meetings, and required submission of bi-monthly reports to an oversight committee. Solix was also subject to out-of-state governmental audits on a regular basis. The audits, if conducted in person, were done at the New Jersey headquarters. However, the out-of-state call centers were also subject to regular audit at their respective locations.

The E-Rate program, which accounted for roughly 50% of Solix's business, involved administering subsidies offered by the federal government to fund the internet needs of schools and libraries, nationwide. Solix's services included receipt and review of web-filed applications, technology plans, broadband needs, and equipment specifications. Solix verified the accuracy of the information provided by the applicants, a more labor-intensive process than the Lifeline program, due to the (a) quantum (over 40,000 applications per year); (b) complexity of federal requirements for eligibility; (c) need for compliance with State-specific formulas for receipt of

funds; (d) analysis to determine whether the request was reasonable; and (e) screening required to identify fraud or waste. As with the Lifeline program, here also, Solix approved or denied applications, but unlike the Lifeline, a denial could trigger appeals heard in Washington D.C., with Solix's required participation.

The E-Rate program was primarily administered by Solix's staff (about 20-30 employees) at its New Jersey location. Solix also utilized a Kansas call center for this purpose. As with the Lifeline program, here also, the software used to review applications was designed and developed in New Jersey, and the New Jersey located servers stored the E-Rate pertinent data. Solix's management traveled to Washington, D.C. as part of the oversight by the federal government, in addition to electronically submitting reports regularly.

Solix had two other lines of business. One was a customer service operations administered for Blue Cross Blue Shield ("BCBS") targeting Alabama residents. Solix's out-of-state employees (some of whom were licensed insurance agents) performed all the necessary functions such as addressing customer inquiries regarding insurance coverage, reimbursement, and enrollment. Solix also reviewed insurance claims at its call center in Indiana. This was a high-volume service especially during annual open enrollment periods.

The other business line was in Missouri, and involved peer reviewing grant applications. Solix had about twenty or so employees for this line of business, all of whom were located outside of New Jersey.

**SOLIX'S ALLOCATION OF RECEIPTS FROM SERVICES**

On its CBT returns for tax years 2011 and 2012, Solix allocated 82.42% and 82.21% respectively to the numerator of the receipts fraction. This resulted in a total New Jersey receipts factor (services plus other business receipts) of 73.94% and 74.18%.

In 2016, Solix amended its returns using the COP method so it could add payroll and subcontractor payments as direct costs. This lowered the numerator of the receipts factor to 62.3196% and 73.51% for each tax year 2011 and 2012[4] (resulting in a lower total New Jersey receipts factor of 56.13% and 66.36%). The amended returns triggered a refund request of $87,058 (tax year 2011) and $46,042 (tax year 2012).

In connection with the review of the refund request, Taxation's auditor requested that Solix clarify its business activities with a breakdown of gross receipts by state (and type, such as internet sales). She also asked Solix to explain why the COP method was appropriate.

In reply, Solix filed a second set of amended CBT returns, stating that pursuant to N.J.A.C. 18:7-8.10(a), a market-based (customer destination) sourcing was a more appropriate method because it was "more reflective of the economic realities of its business." A one-line description of its business was that it "delivers its report to its customers" within and without New Jersey. The second amended CBT returns reduced the service receipts factor to 27.14% (tax year 2011) and 22.74% (tax year 2012) "to reflect only receipts from services/reports for customers located in New Jersey."[5]

---

[4] About 99% of the total payroll costs were attributed to New Jersey ($27,305,640 compared to a total (everywhere) payroll of $27,471,246) for tax year 2011. The subcontractor costs were $3,781,291 (New Jersey) and $22,411,819 (everywhere). The total payroll and subcontractor payments provided a 62.32% COP allocation factor.

For tax year 2012, the New Jersey payroll was $29,875,912 (as compared to the everywhere payroll of $30,104,959), and the subcontractor costs were $4,338,419 (New Jersey) and $16,441,238 (everywhere). The total payroll and subcontractor payments provided a 73.15% COP allocation factor.

[5] The second amended CBT returns allocated 86.51% and 93.81% as payroll to New Jersey for each tax year 2011 and 2012 respectively, exclusive of subcontractor costs.

Taxation's auditor responded that since Solix was involved in "internet based sale of services," the COP "is not [the] correct methodology" for calculating the numerator of the sales fraction. Rather, she stated, the 25-50-25 method should be applied. She also denied the requested refunds on grounds Solix failed to provide her information that she had previously requested.[6]

Solix protested the refund denial administratively.[7] It stated that while it had used the 25-50-25 method for tax year 2010, it believed for tax years 2011 and 2012 the "location of its customers (i.e. destination based)" was more appropriate. It also provided a detailed description of its business, noting that it agreed with Taxation's auditor that the COP method should not apply.

Based on the information provided, Taxation's Conference and Appeals branch ("CAB") found that "Solix should be allocating their service receipts using the [COP] method." The CAB noted that Solix performed most of its services in New Jersey, some in Kansas, and used subcontractors for out-of-state services, and that the subcontractor costs could only be accounted for using the COP method.[8] The CAB accepted Solix's first amended returns (which had used the COP method), denied considering the second amended returns (which had used the market-based method), and granted a refund of $87,058 (tax year 2011) and $46,042 (tax year 2012).

---

[6] During trial, the auditor testified that she still believed that the 25-50-25 method was correct, as did her immediate supervisors. She conceded that Solix's 2010 CBT return, which had used the 25-50-25 method to allocate service receipts from the same Lifeline and E-Rate services, had been accepted by Taxation. Note that both parties agreed that tax year 2010 is not at issue.

[7] At this point, Solix asked for a refund of $228,867 (tax year 2011) and $302,912 (tax year 2012).

[8] The payroll fraction of the allocation factor is the "wages, salaries and other personal service compensation . . . of officers and employees within the State divided by the total wages, salaries and other personal service compensation . . . of all the taxpayer's officers and employees within and without the State." N.J.S.A. 54:10A-6(C) (2011).

Taxation then issued its final determination on April 17, 2019, reiterating the CAB's findings. It concluded that since Solix performed services both in and out of New Jersey, and since its subcontractor costs would only be included under the COP method, that method was "the most appropriate way for [Solix] to allocate New Jersey receipts."

At trial, Taxation's two other witnesses (CAB employees) testified in accordance with the CAB's findings and final determination. They added that COP was the correct method since about 90% of Solix's payroll factor was allocated to New Jersey, and that the regulation did not allow for, nor was ever used to, justify market-based allocation. They stated that the use of market-based allocation was only permissible if Solix asked Taxation for relief under N.J.S.A 54:10A-8 ("Section 8"),[9] and that the 25-50-25 method was a fallback provision used only when the other subsections of the regulation did not capture receipts.

**ANALYSIS**

Since it is undisputed that Solix performs services both within and without New Jersey, the sole issue here is which method is appropriate to compute the numerator portion of the receipts factor. Solix argues that the economic realities of its business activities requires market-based or destination-sourcing method. If not, it argues that the 25-50-25 method should apply.

Taxation contends that by law, market-based sourcing was unavailable for tax years 2011 and 2012 as evidenced by the change in law permitting this method starting in 2019. Therefore, only the COP method is appropriate, especially since Solix performed most of its services in New

---

[9] N. J.S.A. 54:10A-8 provides that Taxation may "adjust" a taxpayer's allocation factor if it deems the same not to " properly reflect the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State" by either excluding or including one or more factors or excluding one or more assets or "applying any other similar or different method calculated to effect a fair and proper allocation of the entire net worth and the entire net income reasonably attributable to the State."

Jersey, allocated most of its payroll to New Jersey, and COP is the only method that captured subcontractor costs.

The court is unpersuaded that law forbade use of market-based sourcing prior to 2019.[10] It is true that N.J.S.A. 54:10A-6(B)(4) as it existed in 2011 and 2012, required that receipts from sales of "services performed within the State" should be included in the numerator of the sales fraction. However, the statute does not plainly state that market-based sourcing of service receipts is barred. Taxation did not point to any legislative history indicating that the location of an entity's market (customer-base) is irrelevant for determining receipts from an entity's sales of services. Nor did this statute indicate whether or how the numerator of the sales fraction should be calculated if services are performed inside and outside New Jersey.

This is reinforced by the plain language of N.J.A.C. 18:7-8.10(a) (2009). Undisputedly, that regulation did not restrict the apportionment exclusively to the COP method, nor did it explicitly bar market-based sourcing as impermissible under N.J.S.A. 54:10A-6(B)(4) (2011). Indeed, by providing for an allocation "by some other reasonable method that should reflect the trade or business practice and economic realities underlying the generation of the compensation for services," the regulation advised the public to the contrary. Taxation's preference for the COP method does not foreclose consideration of the alternative methods permitted under the regulation.[11] Thus, if destination or market-based sourcing of sales receipts is supported by the

---

[10] Taxation never asserted that market-based sourcing was barred as a matter of law as a reason for its denial of Solix's refund denial during the audit, conference, or in its final determination.

[11] See e.g. 29 N.J.R. 3426(a) (Aug. 4,1997) (proposed amendments to N.J.A.C. 18:7-8.10 was "to show more clearly [Taxation's] . . . emphasis on the cost of performance for sourcing purposes for receipts from services" but also to "take[] into account the use of the locations of the origination and termination in these transactions" and to "describe[] a formula for the proper treatment of receipts as the result of use of . . . internet access where the taxpayer otherwise has nexus with

economic realities underlying the generation of income, then it is a permissible under Taxation's regulation even if it that "reasonable method" is not labeled as "market-based," "destination-based," or "benefit-based." Otherwise, the regulation would be construed as either impermissibly vague (to be then construed in favor of the taxpayer) or meaningless (an exercise not lightly undertaken by any court).

Additionally, precedent recognized market-based sourcing as a valid methodology for tax years prior to 2019. See Bank of Am. Consumer Card Holdings v. State Div. of Taxation, 29 N.J. Tax 427, 464-467 (Tax 2016) (late payment or other fees charged by credit card companies to New Jersey consumers should be allocated to New Jersey since "[t]he economic reality is that the taxpayers have their money invested here in New Jersey through unsecured credit card loans which are being repaid by New Jersey customers" and "[j]ust like the manufacturer, the service provider allocation should be based upon where the benefit of the service is derived or earned, not necessarily where the service is technically performed");[12] Mayer & Schweitzer v. Director, Div. of Taxation, 20 N.J. Tax 217 (Tax 2002).

Taxation contends that these cases are inapplicable because they involved sale of intangible property, not services. The argument misses the point. The underlying philosophy of those cases was that for allocation purposes, sales of intangible property and services should be treated the same as sales of tangible property because this accords with the intent of the CBT Act and

New Jersey"). While examples address specific instances, they do not restrict the scope of the regulation, thus, do not restrict or foreclose the regulation's applicability to other businesses/business models which derive income from sales of services.

[12] The tax years at issue in this case was 2002-2008. Although the court would have allocated 100% of the receipts to New Jersey because of the taxpayer's New Jersey market, it nonetheless sustained Taxation's lower 25-50-25 allocation. Bank of America, 29 N.J. Tax at 472.

principles of fair apportionment. See Bank of America, 29 N.J. Tax at 463-65 (late payment fees are intrinsically connected to the taxpayer's services of providing loans to New Jersey based credit card holders and "[j]ust like the manufacturer, the service provider allocation should be based upon where the benefit of the service is derived or earned, not necessarily where the service is technically performed"). The court noted:

> The Legislature in adopting and amending this legislation over the years has clearly looked to having corporations which derive a benefit (i.e. monetary receipts) from New Jersey contribute their fair share to the support of the government that facilitates an economic environment that fosters economic activity. Through . . . [N.J.S.A. 54:10A-6], the Legislature is not looking to tax economic activity that does not result in an economic benefit to a taxpayer that is derived from New Jersey.
>
> [Id. at 466.]

See also Mayer, 20 N.J. Tax at 230 ("The structure of a taxing system designed for a manufacturing economy must adapt itself to the realities of modern business practices and an economy which raises revenues from sources other than the sale of tangible goods."); Synthes USA HQ, Inc. v. Commonwealth, 289 A.3d 846, 878 (Pa. 2023) (agreeing that the Department of Revenue's use of a market-based sourcing for services performed by the taxpayer for tax year 2011 conformed to the "treatment of sales of tangible personal property").

Further, even pre-2019, the numerator of the sales factor was uniformly viewed as receipts earned from services benefitting the consumers of a particular state. See e.g. Brunswick Corp. v. Director, Div. of Taxation, 11 N.J. Tax 530, 539 (Tax 1991) (while the property and payroll allocation reflects the "situs" of the state where the "wealth-creating aspects of the multi-state corporation" lie, the receipts reflect the situs of "the state [which] provides a market for the corporation's output") (citation and internal quotation marks omitted); Synthes, 289 A.3d at 877

14

(in the three-factor allocation formula of property, payroll, and sales, "the activity relevant to the sales factor is that of the state's consumers buying the good, service or other product," thus the numerator of the sales factor is the "contribution of Pennsylvania consumers and purchasers to the [taxpayer's] sales").

Moreover, there is no legislative history (sponsor's or committee statement) that would support Taxation's argument. The amended language was introduced in the Governor's veto as a recommendation, and adopted by the Legislature. See Governor's Veto Statement to A. 4202 at 2 (July 1, 2018) ("Among other revisions, I am recommending changes to support New Jersey-based companies by including market-based sourcing"); L. 2018, c. 48 (approved July 1, 2018), Assembly No. 4202 (First Reprint). The amendment simply clarifies that destination sourcing *should be* the accepted allocation method.

In sum, the court is unpersuaded by Taxation's argument that by law, a taxpayer could not use market-based sourcing of receipts from sales of services prior to 2019, as evidenced by the 2018 amendment to N.J.S.A. 54:10A-6(B)(4).[13]

Based on the facts, the court finds as follows. Solix had a significant New Jersey presence. It was headquartered in New Jersey, its "brains" (management/executive functions, IT architects) were in New Jersey, as were its computer servers. Solix created and/or modified its proprietary software in New Jersey to meet its non-New Jersey clients' needs. Its payroll allocation to New Jersey was also significant for the tax years at issue. Solix executed a major portion of the E-Rate

---

[13] See also Letter Ruling 2012-5-CBT (June 29, 2012), where Taxation in addressing the sourcing of multi-state income from issuance and sales of gift cards/certificates, stated that it "recognizes the need for market-based sourcing due to recent technological advances and contemporary business models that have caused other alternative apportionment methodologies to become obsolete."

program in New Jersey on behalf of the federal government for the benefit of nation-wide non-profit entities.

Undisputedly, almost 99% of Solix's clients (including BCBS) were non-New Jersey entities. Excluding BCBS, these entities outsourced to Solix, the governmental function of providing subsidies to qualified non-New Jersey residents (Lifeline) or nation-wide non-profit entities (E-Rate). By acting as a third-party administrator of the E-Rate and Lifeline programs, Solix performed the same services that these non-New Jersey subsidy providers (governmental entities) would have otherwise performed outside New Jersey for the benefit of non-New Jersey subsidy recipients. Solix did not market its services. Rather, it procured such business via renewed governmental contracts (through a bid process) or due to its reputation. The BCBS outsourced the non-New Jersey customer service portion of its operations to Solix.

Solix's compensation for its services was not attributable solely, or even primarily, to and for the creation and use of its proprietary software, or for executing the E-Rate program from New Jersey for the federal government's non-New Jersey grant beneficiaries. Instead, it was for Solix performing the sum-and-substance of what otherwise would have been a governmental function, on behalf of several non-New Jersey governmental entities. Solix effectuated these governmental functions through its hands-on interactions with, and assistance to, non-New Jersey subsidy recipients. This high-volume, comprehensive work (inputting the information, reviewing the same, qualifying the recipient, generating status/final reports to the customers) was performed by almost 70% of Solix's non-resident employees through call centers located outside New Jersey. The out-of-state locations were also subject to regular audit by Solix's out-of-state clients. Even the E-Rate business had an out-of-state call center to perform some of the customer service functions for non-New Jersey subsidy recipients. Solix's management traveled frequently to

16

satisfy their out-of-state customers' needs, whether it was for sales presentations, responding to customer inquiries, or assisting governmental entities manage their subsidy programs. These facts cannot be minimalized because without effectuation, execution, and maintenance, Solix's proffered business solutions would simply be an academic exercise. The court agrees with Solix that its business value was not in its software or equipment, but was its workforce, a majority of which were non-New Jersey residents, who, out-of-state, performed, a high-volume of services such as processing, reviewing, and qualifying non-New Jersey residents for subsidies offered by their respective non-New Jersey governmental entities, or customer services for Alabama residents on behalf of BCBS.

Solix's use of computer-driven solutions created by its New Jersey IT staff to support its services does not mean that the services for which it was compensated were performed in New Jersey for a New Jersey market. No doubt these elements were part and parcel of Solix's business solutions, but they were not the primary driver of Solix's revenue from services. Contrary to Taxation's argument, and based on the facts herein, Solix's business receipts were not generated in New Jersey just because its software creation, its software architects, and its computer servers were in this State.

The economic reality for the tax years at issue was that nearly all of Solix's clients were located outside New Jersey; a majority of Solix's employees performed their duties outside New Jersey; and Solix earned compensation for services that it performed on behalf of its non-New Jersey customers for the benefit of non-New Jersey residents and non-New Jersey non-profit entities. Solix's New Jersey market was limited to one entity, Virgin Mobil, but even services to that entity indirectly benefited residents in over 40 states. With due consideration to, and balancing

17

of all facts, the court finds that Solix appropriately used market-based sourcing on its second amended CBT returns.

Solix's allocation of about 90% of its payroll to New Jersey, does not detract from these findings since it is undisputed that about 70% of Solix's workforce were located out-of-state and performed services out-of-state for 99% of Solix's out-of-state customers. Further, using the 90% payroll allocation as a basis to justify an increase the sales fraction would be tantamount to double dipping. See Mayer, 20 N.J. Tax at 232 (where the taxpayer had the "bulk of its property and [payroll] in New Jersey," but the "bulk of its customers throughout the nation," it would be inconsistent with the purpose and intent of the CBT Act, and an "unfair apportionment" of the taxpayer's income, if the "bulk of its sales as well as the bulk of its payroll and property" were allocated to New Jersey).

That Solix could only account for subcontractor costs under the COP method does not mean that Solix is barred from using the economic reality of its activities to compute the numerator of the sales from receipts fraction. This is especially true where most of the subcontractor costs were incurred outside of New Jersey. Consideration of the issue before the court requires consideration of the totality of the circumstances otherwise the regulatory provision permitting a methodology based on the "business practice and economic realities" of the income producing activity would be meaningless.

The court is also unpersuaded by Taxation's contention that Solix's only recourse was to request an adjustment under Section 8. Following this argument, any appeal to this court on an allocation issue where Taxation disagrees with a taxpayer would be futile, since, per Taxation, relief would only be available at an administrative level. This is clearly untenable. Second, Solix did request an adjustment to its allocation factor via its second amended returns. Taxation denied

18

the request.  It is not credible for Taxation to now argue that Solix should have requested relief under Section 8.  As an aside, it is also not credible for Taxation to contend that market-based sourcing is unavailable by law, yet would be available under Section 8.

Taxation's final determinations are no doubt entitled to a presumption of correctness. Indeed, "the Director's expertise, particularly when exercised in the specialized and complex area" of the CBT Act "is entitled to great respect by the courts." Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327 (1984).  Nonetheless, courts "are not obliged to stamp their approval of [Taxation's] . . . administrative interpretation." Koch v. Director, Div. of Taxation, 157 N.J. 1, 8 (1999) (citation and internal quotation marks omitted).  Here, based on the record, the court finds that Solix overcame the presumption of correctness of Taxation's final determination, and proved, by a preponderance of evidence, that its use of market-based sourcing to calculate the numerator of the sales fraction, is appropriate as reflecting the economic actualities of its income-producing services.  Therefore, the court finds that Solix's refund request (via its second amended CBT returns) is proper for tax years 2011 and 2012.[14]  Due to this conclusion, the court need not address Solix's alternative contention that the 25-50-25 methodology should apply.

---

[14] Solix contends that there is no presumption of correctness because Taxation's auditor believed the COP as an inappropriate allocation method, but the CAB did not.  The CAB can affirm, reject, or change the audit conclusions, whether based on the facts or on the law.  See N.J.S.A. 54:49-18 (a taxpayer can protest "any finding or assessment of the director" after which "the director . . . shall make a final determination confirming, modifying or vacating any such finding or assessment"); N.J.A.C. 18:32-1.1 (an "administrative hearing or protest review results in a Final Determination, which confirms, modifies, or vacates the finding or assessment under review"). While Taxation's internal disagreement of the appropriate method, and its first-time defense that market-based sourcing is legally barred, may suffice to overcome the initial presumption of correctness of its final determination, it is still Solix's burden to persuade the court why its approach is correct or more credibly appropriate.

The court notes that for tax years prior to 2019, there <u>is</u> no hard-and-fast rule as to the use of COP method. This is precisely why Taxation interpreted N.J.S.A. 54:10A-6(B)(4) (2011) broadly and flexibly. It is not unusual for a taxpayer or Taxation to prefer the approach most conducive to their respective positions, as is evident in this case.[15] <u>Cf.</u> <u>Synthes</u>, 289 A.3d at 875 ("colorable arguments can be made" by both the taxpayer and the taxing authority whether an income-producing activity for purposes of allocation of revenues from sales of services "occurs either where the taxpayer produces the service or where the customer receives the service"). In short, the resolution of the issue here requires a fact-sensitive analysis based on the totality of the circumstances. It is this very same analysis upon which the court's ultimate findings and conclusions rest.

**CONCLUSION**

For all of the aforementioned reasons, the court finds that Solix is entitled to the refunds it claimed on its second amended CBT returns, with the appropriate statutory interest.

---

[15] <u>See e.g.</u> Charles E. McClure, Jr., <u>Taxation of Electronic Commerce: Economic Objectives, Technological Constraints, and Tax Law</u>, 52 <u>Tax L. Rev.</u> 269, 347 (1997) ("businesses engaged in electronic commerce in content want to convince their home states to use a market-related measure, while encouraging market states to use the . . . [COP] standard, thereby effectively eliminating these sales from the numerators of all state apportionment formulas"); John A. Swain, <u>Reforming the State Corporate Income Tax: A Market State Approach to the Sourcing of Service Receipts</u>, 83 <u>Tulane L. Rev.</u> 285, 302 (2008) ("Even state taxing authorities have reported difficulties in applying the UDITPA sourcing standard to the sale of services.") (citation omitted).